UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**JAMIE VICKERS,**                           CASE NO.: 5:19-cv-

    **Plaintiff,**

v.

**BAY HAVEN CHARTER ACADEMY, INC.,**

    **Defendant.**
_____/

## COMPLAINT

Plaintiff, JAMIE VICKERS, for her Amended Complaint, hereby sues Defendant, BAY HAVEN CHARTER ACADEMY, INC., and alleges:

### NATURE OF THE ACTION

1. This is an action brought under 42 U.S.C. §2000e, *et seq.*, 42 U.S.C. §1981a, and Chapter 760, Florida Statutes Jurisdiction of this court is invoked pursuant 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §1343 (civil rights claim jurisdiction), and 28 U.S.C. §1367 (supplemental jurisdiction).

### PARTIES

2. At all times pertinent hereto, Plaintiff, has been a resident of Florida and was employed by Defendant. Plaintiff is a member of protected classes

because of her gender and because she reported and/or opposed unlawful employment practices and was subject to retaliation thereafter.

3. At all times pertinent hereto, Defendant, BAY HAVEN CHARTER ACADEMY, INC. ("BAY HAVEN"), has been a corporation doing business within Florida and within the jurisdiction of this court. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer with regard to these claims.

## CONDITIONS PRECEDENT

4. Plaintiff has satisfied all conditions precedent to bringing this action. More specifically, Plaintiff has dual-filed with the EEOC two charges of gender discrimination and retaliation. She has received her right to sue letters as to both charges and timely filed this action thereafter.

## STATEMENT OF ULTIMATE FACTS

5. Jamie Vickers is a 49-year old, award-winning educator who has been licensed for 25 years. She was rated "Highly Effective," the top rating, in her evaluations for years 2014-2015, 2015-2016, 2016-2017 and 2017-2018. In her last year at Bay District Schools, before coming to Bay Haven, she was named Assistant Principal of the Year. She was twice the School Administrators Association's President and the Vice President before that. She was the

Administrative Representative for the Association of Bay County Educators' contract negotiations. In Texas, before coming to Florida, Ms. Vickers was a two-time Golden Apple award winner for educational excellent. She was one of 24 General Electric (GE) Grant winners in a nationwide selection. She was recognized by Florida First Lady Ann Scott as an Educator of Interest for her superior work in helping children. She holds a bachelor's degree in mathematics and a master's degree in educational leadership. She has generally received pay increases every year since she began working at Bay Haven. She has never received a pay cut. She has sometimes received bonuses. She is happily married.

6. In 2018 she was sexually assaulted, multiple times, by the CEO of Bay Haven. She unambiguous rejected each and every such assault and, predictably, suffered the consequences. Her reputation was smeared. She was ambushed in a meeting with a school lawyer and stripped of her principal position and told she would be paid $40,000 to go away. When she stood her ground, she was given frivolous, demeaning assignments that duplicated tasks the school had already done. In diligently working to complete the assignments, Ms. Vickers asked for the work previously done so she could improve on it, and Bay Haven officials refused. The ambushed demotion, the offer of $40,000 cash, and the demeaning assignments were intended to break Ms. Vickers' spirit to the point

where she would leave and further intended to protect CEO Bollinger by concealing his behavior.

7. In 2018, just after a budget committee meeting and just before a Bay Haven board meeting, Bay Haven Chief Educational Officer (CEO) Larry Bollinger followed Ms. Vickers out of his office slapped her in a crude, sexual way on her buttocks. As he did so, he said "Congratulations," apparently referencing Ms. Vickers' success in getting budget committee approval for capital expenditures at her school. Vickers' face registered immediate disapproval, which Bollinger saw and in mocking response said, "Oh my God! I can't believe I just did that….but it's a nice ass." Vickers called her husband for support and then, seeing a school administrator (Windell Spivey), told him that Mr. Bollinger had just slapped her on the buttocks as if to grab her. Spivey, a former member of the US military, carries a green journal and jotted down his observation of Ms. Vickers' report.

8. On another occasion in 2018, Ms. Vickers was in CEO Bollinger's office when Bollinger grabbed Ms. Vickers to hug her, reached from the side, reached around, and grabbed her breast. This sexual assault was intentional. The next day, during an eighth-grade picture session in the gym, Bollinger, after most everyone left, told Ms. Vickers "I didn't really mean to grab your breasts the other day." This statement was false as Mr. Bollinger intended to hug her and grabbed Ms. Vickers breast in an intentional manner.

9. On another occasion in July 2018, following a presentation to the Bay District Schools Half Cent Sales Tax Committee, CEO Bollinger approached Ms. Vickers and complimented her on the quality of her interactions with the committee, and he again went to hug her, but this time slid his hand down on Ms. Vickers' hipbone extremely close to her crotch. Ms. Vickers was wearing a dress at the time. It was clear, on this occasion and on the previous occasions, that CEO Bollinger was testing Ms. Vickers' willingness to engage in sexual activities with him. None of the assaults were accidental or could be explained by accidental physical contact. All of the assaults involve purposeful movements and gestures that made contact with Ms. Vickers buttocks, breast, or in the region of her vagina. This assault was extremely dramatic to Ms. Vickers because there were other people around, although the assault could not have been witnessed by many because of the way Ms. Vickers and Mr. Bollinger were standing in relation to others. Clearly, Mr. Bollinger was sending her a message that he felt he could do whatever he wanted to her, even in front of others.

10. From time to time, CEO Bollinger would make comments to Ms. Vickers to the effect that he knew she could destroy his career if she revealed his assaults and that he hoped she would not do so.

11. Ms. Vickers feared retaliation if she reported the assaults by CEO Bollinger. Bay Haven had recently gone through a series of discrimination,

harassment and retaliation complaints involving sexual discrimination and harassment. Those complaints were made by at least one principal, at least one assistant principal, and several teachers. All of them lost their jobs. Two of them, Michelle Gainer and Erin Harper, were fired in very public and humiliating ways following their complaints of gross misconduct by senior Bay Haven officials. Ms. Vickers did not want to endure the same abuse. Nonetheless, in 2018 and after several assaults by CEO Bollinger, Ms. Vickers bravely stepped forward to speak confidentially to Bay Haven board member Jon McFatter. His first comment to her was that she should report it. When she said that if she did, she would probably lose her job, Mr. McFatter looked at her and said, "Probably." She avoided CEO Bollinger whenever possible, and would back out of meetings that she knew Bollinger would attend. On occasion, Bollinger would ask her to ride with him alone in his car, and she declined.

12.     Shortly after the July 2018 assault, Mr. Bollinger issued a reprimand to Ms. Vickers for her alleged poor job performance. The accusations in the reprimand were false. In fact, Ms. Vickers spoke with several individuals about the purported facts supporting the reprimand and those individuals confirmed to Ms. Vickers unequivocally that CEO Bollinger's accusations were false. But the message to Ms. Vickers was nonetheless clear. Bollinger felt emboldened to

continue his assaults on her, and there was going to be career consequences for her in refusing his sexual advances.

13. After the retaliatory reprimand, Ms. Vickers reached out to board member McFatter by text message on August 9. She asked McFatter to meet her privately, off-campus at a Beef O'Brady's at 2310 FL-77 #350, Lynn Haven, FL 32444. (That location is referenced in Mr. McFatter's text messages as "beef o Brady's LH.") Ms. Vickers met with Mr. McFatter at 3:45 PM and discussed the fact that CEO Bollinger was now retaliating against her for her refusal to engage in sexual activities with him. They specifically discussed the details of the retaliatory reprimand, and he was dumbfounded at the conduct of Bollinger. On August 16, Mr. McFatter and Ms. Vickers exchanged text messages again and set up another off-campus meeting at Beef O'Brady's. During that meeting, Mr. McFatter told Ms. Vickers that he would have to report the sexual assaults or might get into trouble himself if the other board members learned he knew of these events and did not come forward.

14. On August 31, 2018, Ms. Vickers and her husband, David Vickers, were called to an attorney's office in Panama City. They were not told in advance what the purpose of the meeting was, but when they arrived, they learned that Mr. McFatter had disclosed what Ms. Vickers had reported in confidence for fear she would lose her job. In this meeting, the school's lawyer and its HR chief, Elizabeth

7

Austill, grilled Ms. Vickers about the assaults and other hostile-work-environment events. The lawyer and Ms. Austill refused to allow Mr. Vickers to sit in on the meeting. He was forced to stay outside, in a hallway.

15. At some point, after Ms. Vickers was ambushed in the school attorney's office, her complaints were revealed to CEO Bollinger, and on September 5, 2018, he gave her a second reprimand. This reprimand, like the first, was punitive in nature and retaliation against Ms. Vickers both for refusing his sexual advances and for coming forward to oppose them. Mr. Bollinger spoke to Ms. Vickers in a demeaning, derogatory manner and admonished her for alleged job failures. Mr. Bollinger also demanded that Ms. Vickers write her own performance improvement plan based on his retaliatory discipline.

16. After the second retaliatory reprimand, but still in September 2018, Ms. Vickers and her husband were ordered back to the school's attorneys' office to learn their purported findings. At this meeting were the school's lawyer, school HR chief Elizabeth Austill, Ms. Vickers, and her husband. In this meeting, the lawyer and Ms. Austill told the Vickers that CEO Bollinger admitted to slapping her on her buttocks, but said that as to the breast-groping incident and the crotch-groping incident, it was simply a misunderstanding and an accident. The lawyer declared the assaults an "accident" and compared them to the incident at Aretha Franklin's August 31, 2018 funeral, where a pastor was accused of reaching

around and groping singer Ariana Grande's right breast. In this meeting, the school attorney told Ms. Vickers that he wanted to keep the complaint and possible resolutions informal, so that nothing would be subjected to the Florida Public Records Act. That law requires employers subject to its provisions to preserve documents and to make them available to members of the public upon request. The attorney further said told Ms. Vickers that that they were going to go to the board, but would keep her complaints confidential, saying only that an employee had filed a complaint, and that they (the school attorney and Ms. Austill) did not believe the breast, buttocks, and crotch groping amounted to harassment of a sexual nature. The attorney and Ms. Austill told Ms. Vickers that CEO Bollinger would remain her immediate supervisor, would still evaluate Ms. Vickers in the future, and would remain in his office. But, they said, he would be required to undergo sexual harassment training. The school attorney told Ms. Vickers that the only three people interviewed were Ms. Vickers, CEO Bollinger, and employee Spivey. The school attorney was dismissive of Ms. Vickers' sexual assault complaint.

17. Ms. Vickers learned that after this meeting, where the school attorney and HR chief announced they are "findings," the HR chief, possibly with the school lawyer, went to each board member and share their recommendations, including the recommendation that CEO Bollinger still be allowed to perform the

9

annual evaluations for Ms. Vickers. In at least one of those meetings with board members, Ms. Austill allowed Ms. Vickers' assailant, CEO Bollinger, to sit in on the conversations while she explained the charges against him. This process allowed Mr. Bollinger to smear Ms. Vickers as the accusations were being presented against him. The school's actions in allowing the assailant to present a defense at the same time that confidential accusations were being shared are unheard of, and spotlights the impropriety of the investigation and resulting response by Bay Haven. Further, at least one board member expressed incredulity` at Austill's claim that, on the one hand, there was no sexual harassment and, on the other, that CEO Bollinger was being forced to take online sexual harassment training classes.

18.   It became apparent that Bay Haven was not going to address the problem of sexual harassment, no more than it addressed prior complaints of serious harassment by female school employees.  Further, Ms. Vickers was alarmed that Austill and possibly the school lawyer had revealed her name and/or had allowed others to do so.  That was at odds with statements made by the HR chief and school lawyer that the process was going to remain confidential, certainly at least as to her identity. At that point, and because the school's representatives had violated their promise to keep her identity and confidence, Ms. Vickers in October 2018 filed a federal Charge of Discrimination with the Equal Employment

Opportunity Commission (EEOC). The charge specifically alleges that Ms. Vickers was the victim of a sexually-hostile work environment that she complained about the hostility, and was subjected to discipline. It further alleges gender-based disparities in compensation.

19. Bay Haven knew it was coming because on October 5, 2018, Ms. Vickers sent an email to both the school lawyer and its HR chief informing that because they violated the agreement they had with her, she felt compelled to take steps to protect her legal rights. Upon information and belief, the EEOC received a copy of her charge on October 31, 2018. Upon information and belief, the school received a copy of the Charge immediately. That became apparent because on November 1 or 2, 2018, Ms. Vickers was speaking to the HR chief, and she informed Ms. Vickers that the school had received a copy of her charge.

20. On November 9, 2018, just nine days after Ms. Vickers asserted her rights under federal and state anti-discrimination laws, the Vickers were called back to the lawyer's office and met again with the lawyer and HR chief Austill. This meeting lasted about 30 minutes. Once again, the Vickers were not told in advance what the meeting would be about. When they arrived, they were stunned to learn that the school's representatives had prepared a separation agreement calling for Ms. Vickers to quit. The severance agreement makes clear that Bay Haven was attempting to force Ms. Vickers from her position because she filed the

Charge of Discrimination. The severance agreement specifically references the EEOC charge as a basis for Vickers' separation, an admission by Bay Haven that it wanted her out because of her complaints of discrimination. Such motives are plainly unlawful. But it is not the only illegal provision in the agreement. The separation agreement further demands, in paragraph 13, that Ms. Vickers "... Agreed to keep all matters concerning this Agreement, as well as the facts, circumstances, and contents of this Agreement, confidential . . .." Florida law forbids such provisions in settlements involving organizations such as Bay Haven. Section 69.081(8)(a), Florida Statutes provides in part that that "Any portion of an agreement or contract which has the purpose or effect of concealing information relating to the settlement or resolution of any claim or action against the state, its agencies, or subdivisions or against any municipality or constitutionally created body or commission is void, contrary to public policy, and may not be enforced. . .." Bay Haven receives public funding and is subject to the Florida Public Records Act, Chapter 119, Florida Statutes.

21.   In addition to being provided the severance agreement, the school attorney also passed across his desk to Ms. Vickers a job description that appeared created on the fly, a make-work position that did not previously exist and appeared to have nothing but short-term duties. This meant that if Ms. Vickers did not immediately sign the separation agreement, she would be stripped of her principal

position, a devastating and degrading change of position. The attorney referred to it as being placed on "special assignment." One of the immediate assignments was to create a project that, upon information and belief, the school had recently completed. Indeed, Ms. Vickers requested copies of the previously-completed work to avoid undue duplication, and the school refused. Another make-work assignment, the completion of a full-blown application to create a virtual school from scratch, was of such magnitude that others who have been through the process told Ms. Vickers it could take up to three months to complete. It would also require the active involvement of virtually every administrator at the school, most of whom have been shunning Ms. Vickers since she bravely came forward with her sexual harassment complaints.

22.    Further, when Ms. Vickers was given her separation papers and demotion papers, she was ordered to return to the school and immediately clean out her personal belongings. She was also told to turn in all her keys that allowed her access to school facilities. She was ordered to drive directly to the school to remove those belongings. And she did so. Before leaving the lawyer's office, she was told that Ms. Austill would meet Ms. Vickers back at the school but that the Vickers were not allowed to enter the school premises before Austill arrived. While Ms. Vickers was cleaning out her office, she asked Ms. Austill whether the outcome would have been the same regardless of how the conversation went in the

13

school attorney's office moments earlier. Ms. Austill said yes. In other words, it did not matter what Ms. Vickers said or did in the meeting. She was going to be stripped of her principal position. At some point, two School Resource Officers (SROs) arrived to oversee the packing of Ms. Vickers' belongings. The school had apparently called the police to further humiliate Ms. Vickers, because there was no legitimate reason for their presence. And told Ms. Vickers voiced opposition to sexual assault in the workplace, she had been deemed one of the best employees at the school. Now, she was surrounded by police officers and being forced under humiliating circumstances to pack her personal belongings into leave her beloved workplace. This ordeal took place about 2 p.m., while staff and others were still present at the school and could witness events. It was clear the school had already prepared boxes for Ms. Vickers before she arrived, reinforcing the fact that the outcome of the meeting with the school attorney was preordained.

23.  Ms. Vickers was told that she was not allowed on school campuses - that she was banned – unless she had special permission.

24.  Subsequent to these events, Ms. Vickers was given miscellaneous make-work assignments.  Some of the assignments, and the reason the work was obviously intended to waste Ms. Vickers time and degrade her work skills, include the following:

- Insert

- Insert

- Insert

25.	Ms. Vickers' complaints involve one additional component. In July 2016 Bay Haven made a behind-the-scenes alteration to the pay grade of a male K-5 principal at North Bay Haven Elementary, the counterpart school to Bay Haven where Ms. Vickers was principal. The behind-the-scenes pay change resulted in a significant pay increase for the male principal, which created a gender-based, massive pay disparity as compared to Ms. Vickers. At least one board member at Bay Haven strenuously objected to this discriminatory practice saying, in effect, that the school could not do for one person what it was not going to do for everyone. The pay change was approved anyway. Ms. Vickers voiced opposition and concern about the pay disparity and was told by CEO Bollinger, in effect, to pipe down, because he knew the pay increase was not legitimate and that she should be glad she was working there. This pay disparity was discriminatory and conducted in a manner to mask its purpose. The pay increase for the male principal constitutes gender discrimination in violation of Florida and federal civil rights laws, as well as a violation of the federal Equal Pay Act.

26.	Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services. Defendant should be made to pay said fee, along with costs incurred in this action, under applicable law.

## COUNT I-GENDER-BASED DISCRIMINATION

27. Paragraphs 1-26 above are re-alleged and incorporated.

28. This count sets forth a claim for discrimination based upon gender, brought under 42 U.S.C. §2000e, *et seq.*, and Chapter 760, Fla.Stats.

29. Plaintiff has been the victim of discrimination on the basis of her' gender in that she was treated differently than similarly situated employees of Defendant who are male, and has been subject to hostility and poor treatment on the basis, at least in part, of her gender.

30. Defendant is liable for the differential treatment and hostility toward Plaintiff because it controlled the actions and inactions of the persons making decisions affecting her, or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

31. Furthermore, Defendant knowingly condoned and/or ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

32. Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

33. In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were of a gender-based nature and in violation of the laws set forth herein.

34. The discrimination complained of herein affected terms, conditions, and privileges of Plaintiff's continued employment by Defendant.

35. The events set forth herein led, at least in part, to the adverse actions against Plaintiff including, without limitation, to her termination in August 2019 as a further act of retaliation.

36. Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon gender in violation of 42 U.S.C. §2000e, *et seq.,* and Chapter 760, Fla.Stats.

37. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. Plaintiff is also entitled to equitable/injunctive relief under this count.

## COUNT II-RETALIATION

38. Paragraphs 1-26 above are re-alleged and incorporated.

39. Defendant is an employer as that term is used under the applicable statutes referenced above.

40. This count sets forth a claim for unlawful retaliation for Plaintiff having reported or opposed unlawful employment practices adversely affecting her under 42 U.S.C § 2000e, *et seq.*, Chapter 760, Fla.Stats., and other statutory provisions cited herein.

41. The foregoing unlawful actions by Defendant were purposeful.

42. Plaintiff voiced opposition to unlawful employment practices during their employment by Defendant and was the victim of retaliation thereafter, as related in part above.

43. Plaintiff is a member of a protected class because she reported unlawful employment practices and was the victim of retaliation thereafter There is a causal connection between the reporting of the unlawful employment practices and the adverse employment actions taken thereafter.

44. As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiffs has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages have occurred in the past, are occurring at present, and

will likely continue into the future. Plaintiff is also entitled to equitable/injunctive relief under this count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

(a) that process issue and this court take jurisdiction over this cause;

(b) that this court award judgment against Defendant and for Plaintiff granting equitable/injunctive relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c) that this court enter judgment against Defendant and for Plaintiffs awarding all legally-available general and compensatory damages, as well as damages for economic loss, to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d) that this court enter judgment against Defendant and for Plaintiffs permanently enjoining Defendant from future violations of law enumerated herein;

  (e)  that this court enter judgment against Defendant and for Plaintiffs awarding Plaintiff costs and attorney's fees as allowed by law;

  (f)  that this court enter judgment against Defendant and for Plaintiff awarding Plaintiff interest and liquidated damages as allowed by law; and

  (g)  that this court grant such other and further relief as is just and proper under the circumstances, including but not limited to reinstatement.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues herein that are so triable.

DATED this 15th day of July 2019.

            */s/Jim Garrity*
            Jim Garrity [FBN 539211]
            MARIE A. MATTOX, P. A.
            203 North Gadsden Street
            Tallahassee, FL 32301
            Telephone: (850) 383-4800
            Facsimile: (850) 383-4801
            ATTORNEYS FOR PLAINTIFF